## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**ALAN D. KOSINSKI,**                              Chapter 7
      Debtor                              Case No. 06-12691-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~

**STEVEN B. DOUGLAS,**
      Plaintiff
v.                                                      Adv. P. No. 06-1400
**ALAN D. KOSINSKI,**
      Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

Steven B. Douglas ("Douglas" or the "Plaintiff") filed a one-count Complaint against Alan D. Kosinski ("Kosinski" or the "Debtor"), seeking a determination that the Debtor obtained money from him by falsely representing that the financial condition of Boston Waves, LLC ("Boston Waves") and Pavilion Realty Trust, two entities for which the Debtor served as manager and trustee, respectively, "were sound and that the Debtor would use the money loaned to him in furtherance of their investment agreement and mutual understanding and subsequently repay Mr. Douglas as well as provide him with a return on his investment." In his Complaint, Douglas failed to specify whether he sought to except the obligation owed to him from discharge under 11 U.S.C. § 523(a)(2)(A) or 11

1

U.S.C. § 523(a)(2)(B).  Following the trial at which eight witnesses testified and 16 exhibits were introduced into evidence, Douglas filed a "Motion to Allow Filing of Amended Complaint for Nondischargeability pursuant to 11 U.S.C. § 523(a)(2)" and an Amended two-count Complaint in which he sought to except the obligation owed to him by the Debtor from discharge under both 11 U.S.C. § (a)(2)(A) and (B).  The Debtor opposed the Motion.

The issues arising from the trial and the Motion to Allow Filing of Amended Complaint include whether the Plaintiff should be permitted to amend his Complaint on the ground that it conforms to the evidence; whether the Debtor is personally liable for the debts of Boston Waves, a limited liability company managed by the Debtor and/or Pavilion Realty Trust, a Massachusetts nominee trust for which the Debtor served as trustee; and if so, whether any such personal debt owed by the Debtor to Douglas is nondischargeable.  For the reasons set forth below, the Court concludes that Douglas may amend his Complaint to conform to the evidence and that the debt owed by the Debtor to Douglas is excepted from discharge under 11 U.S.C. § 523(a)(2)(B).

## II. FACTS

The Debtor filed a voluntary Chapter 7 petition on August 11, 2006.  He filed his petition, individually, and as "Trustee of various Trusts including but not limited to Pavilion Realty Trust, Classic Realty Trust, Diamond Realty Trust, Columbia Realty Trust, Indian Lakes Realty Trust, First Choice Realty Trust, Eagle Realty Trust, London Bridge Realty Trust, Eagle Investment Realty Trust, Phoenix Realty Trust, AC Funding Realty

2

Trust, Capri Realty Trust, Fernwood Realty Trust, Guardian Realty Trust, Riverside Realty Trust, Workplace Realty Trust, [and] Maplewood Realty Trust."  Additionally, the Debtor listed Douglas as a creditor on Schedule F-Creditors Holding Unsecured Nonpriority Claims, as well as creditors whose claims, some described as contingent, unliquidated, and disputed, are held by witnesses who testified at the trial, including Debra Grumbach, Paul A. Griffin, Fenton Lee, Frank DiNatale, Jr., Harold G. Nabhan, Jr., and Christopher Florek, the Debtor's  former business partner.[1]

The Debtor is a self-proclaimed millionaire, specializing in real estate investing. Despite filing a Chapter 7 petition in which the Chapter 7 Trustee filed a Report of No Distribution on June 27, 2007, Kosinski persists in falsely describing himself as a millionaire on his "ADVENT Wealth Improvement Network" website.[2]

In the 1980s and 1990s, Kosinski purchased and sold hundreds of properties, using borrowed money from "private investors" and nominee realty trusts.  In the early 2000s, he began advertising and conducting seminars and workshops in which he taught those in attendance about "how to rent a property, landlording [sic] techniques, buy a property, negotiation, repairs, fix-up, asset protection, [and] stuff like that."  He advocated the use of trust instruments to prevent lawsuits and protect assets from creditors.  Additionally, on his website, he recommended practicing negotiation techniques for the acquisition of

---

[1] The Court may take judicial notice of its own records.  *See* In re Hyde, 334 B.R. 506, 508 n.2 (Bankr. D. Mass. 2005).

[2] On cross-examination, Douglas' counsel displayed Kosinski's website for his review.

properties listed "for sale by owner."  Indeed, he indicated on his website that "If a 'For Sale by Owner' accepts your offer, you've probably offered too much," and you will have to "Use your Home Inspection Clause or other 'weasel clauses' to get out of it [the contract]."

Kosinski indicated that he had formed over 300 trusts in his career and served as trustee of approximately 150 to 200 trusts.  The Pavilion Realty Trust, a Massachusetts nominee trust, was one of those trusts.  It provided in pertinent part the following:

> The Trustees shall not be held to any personal liability whatsoever in tort, contract, for errors of judgment or otherwise in connection with the Trust property or the affairs of this Trust save only that arising from their own willful misconduct knowingly and intentionally committed; and all person shall look solely to the Trust property for satisfaction of claims of any nature arising in connection with the affairs of this Trust.

The Debtor testified that he found private investors interested in acquiring property by word of mouth and that many people came to him for the purpose of investing in real estate based upon his reputation.  Additionally, he contacted potential investors directly.

Christopher Florek ("Florek"), who became Kosinski's partner in a brokerage franchise known as Exit Realty, testified that the Debtor, in addition to conducting seminars, was involved in a real estate investors' group through which he developed networking opportunities.  Florek indicated that the Debtor scheduled monthly meetings to educate interested parties about "how to invest in real estate and how to find the deal, how to find money to finance the deal, how to know what is a good deal, what isn't a good deal, pretty much anything you would need to know to purchase a property for investment purposes."  Kosinski, who frequently served as moderator, charged an attendance fee of

4

$10 for the monthly meetings and considerably more for the seminars he conducted.
Florek testified that in 2003 he managed the day-to-day operations of the brokerage
business conducted by Exit Realty which had grown substantially from its inception, while
the Debtor pursued investment opportunities in Salisbury, Massachusetts.

In late 2002, the Debtor was approached by an individual named Jack Welch
("Welch") who told him about the availability of a lease of property located in Salisbury,
Massachusetts owned by Harold Nabhan ("Nabhan"). In the early spring of 2003, the
Debtor inspected the property, a 55,000 square foot building located on pilings on Salisbury
Beach, with an address of 4 Ocean Front Avenue and executed a lease with Nabhan in
March of 2003 at Nabhan's home in Florida. The lease was a two-year lease with options.
Nabhan testified that the lease contained two, one-year options, while the Debtor testified
that it contained two, two-year options. Under either view, it was not a long-term lease.
The Pavilion Realty Trust executed the lease with Nabhan which provided for an annual
base rent of $75,000. Pavilion Realty Trust, in turn, sublet a portion of the building to
Boston Waves for an annual base rent of $90,000. The parties did not submit evidence as
to the named beneficiary or beneficiaries of the Pavilion Realty Trust. Similarly, they did
not specifically identify the members of Boston Waves. Kosinski referred to Florek and
Welch as his partners, and the Court takes judicial notice from the bankruptcy case file of
Boston Waves (Case No. 05-11767-JBR) that Kosinski, Florek and Welch were listed as the
members of that limited liability company.[3] The evidence, discussed in detail below,

---

[3] *See* note 1, *supra*, and note 6, *infra.*

5

established that, for the most part, Pavilion Realty Trust borrowed money and then transferred it to Boston Waves.

Nabhan, an attorney who owned and operated several bars in Salisbury Beach, testified that he had operated a nightclub, called the Beach Club, at 4 Ocean Front Avenue for a number of years, though the building had been shuttered since 2001. Nabhan employed a full-time manager, but was involved in the day-to-day operation of the club until it closed. According to Nabhan, the club specialized in banquets, wedding receptions, and music for dancing for which local band were engaged. He revealed that the "nightclub did alright during those years, but the business tapered off after about 1997." He explained that the nightclub business declined because of the prevalence of national chains in the region and the vigilance of the Salisbury police in enforcing laws against drunk driving.

Nabhan testified that Kosinski told him that he intended to put "a new face on the club, to enlarge the market from local to regional band bookings, reaching all the way into Boston," adding "he changed the name of the club to Boston Waves and did substantial promotional, investigation, and administrative work." Nabhan recognized that Kosinski made some physical improvements to the building, replacing doors and some windows, as well as putting in a very expensive light and sound system. Nabhan, nevertheless, stated that the building was "in regular shape to do business" and that extensive plumbing and electrical work was unneeded.

The Debtor testified that not only did he intend to change the focus of the club, he formed a development company to investigate "buying and selling and flipping

6

properties" in Salisbury.  Additionally, he testified that the building needed extensive repairs, requiring hundreds of thousands of dollars worth of work.  He testified at length about work he did on the property, enumerating multiple problems with the structure, as well as the need for substantial improvements to sound system and stage.

Although the Debtor received progressively higher offers (up to $300,000 per year) to lease the nightclub portion of the property, he rejected the offers in favor of pursuing his own development plans for the premises, which included booking all types of bands from country western to hip hop and advertising events extensively.  Admitting that he refused to meet with the individual making the offer and that he had no experience operating a nightclub or restaurant, the Debtor testified that the increasingly higher offers reinforced his notion that the property had great potential as a nightclub.  He added that the individual making the offer also wanted a long-term lease, which the Pavilion Realty Trust did not have.

The Debtor's grandiose plans to develop the property and buy and sell properties in Salisbury ran seriously awry from the outset.  Boston Waves was unable to secure a seasonal liquor license for the 2003 season until the end of October of that year, well past the time vacationers and beachgoers would be expected to travel to Salisbury.

Because it lacked a seasonal liquor license, Boston Waves failed to generate much income in 2003.  Indeed, the receipt ledgers generated by Boston Waves were described by the Debtor's personal assistant as "kind of scary." The ledgers, which were introduced into evidence, show that Boston Waves generated less that $13,000 in revenue from its

7

restaurant for the period between July and December of 2003, and that it generated approximately $10,000 from it's "A-Bar 1" for the same period.  Although Boston Waves intermittently obtained temporary licenses to sell beer and wine for a day or for an event before the end of October, 2003, the absence of a full liquor license deprived it of the ability to advertise events in advance because issuances of the temporary beer and wine licenses were never guaranteed by the Salisbury Liquor Commission.

During 2003, the Debtor testified that he obtained money to renovate the premises and sustain the operations of Boston Waves from private lenders in varying amounts totaling at least $350,000.  For example, the Debtor, in his capacity as manager of Boston Waves and as trustee of Pavilion Realty Trust, executed short term, unsecured promissory notes in the spring of 2003 in favor of Debra Grumbach in the sum of $15,000 and Fenton Lee in the sum of $30,000, among others.  Ms. Grumbach's spouse also invested money with Kosinski.  Ms. Grumbach testified that the couple used money from their IRAs to obtain funds to lend to Pavilion Realty Trust at Kosinski's behest.

Fenton Lee, a systems analyst with Fidelity Investments, testified that he became interested in investing in real estate and, through internet searches, met Kosinski.  After meeting Kosinski and working with an agent from Exit Realty, he stated that he received a phone call from the Debtor who presented him with preliminary information about the nightclub project.  He met Kosinski in April of 2003 at the Salisbury property and decided to make a loan to Boston Waves and the Pavilion Realty Trust.

Andrew Griffin, a construction contractor, was also a private investor.  He testified

8

that he was involved in one of the Debtor's real estate ventures and knew Kosinski from attending his real estate investment classes.  In the spring of 2003, he lent Kosinski $50,000, in his capacities as manager of Boston Waves and trustee of Pavilion Realty Trust.  Griffin testified that he "was instructed to move an IRA into a self-directed IRA, and through the self-directed IRA, the money was moved to him."

Francis DiNatale, also invested a considerable amount of money with Kosinski's entities having met him at a so-called Cashflow game sponsored by Exit Realty.  He initially loaned Kosinski, as manager of Boston Waves and as trustee of Pavilion Realty Trust, $25,000 and then rolled that sum into a $50,000 loan.  In addition, he loaned Kosinski $26,000 from an IRA.  He testified that Kosinski repaid him $5,000 in cash and $5,000, in kind, as a credit for a real estate course.  The Grumbachs, Fenton Lee, Andrew Griffin, and Francis DiNatale, the private investors who testified at trial, were never repaid in full.  All but DiNatale received no payments at all.

Douglas, like many of the other private investors, met Kosinski through events sponsored or hosted by Exit Realty.  Douglas, who is employed as a vice-president of program management at an engineering firm, testified that after his divorce he became interested in investing in real estate and went to a couple of Cashflow game meetings.  He then started regularly attending the investment club meetings where he met Kosinski.  At one such meeting, held in January of 2004, he picked up a leaflet that caused him to pursue the opportunity described in it with Kosinski.  The leaflet set forth the following:

9

Best Investment:

Many people have accounts that are not paying the yields they should.  Below is a comparison chart of various investments that are available and how they actually perform. ING DIRECT was used since they [sic] are one of the highest paying funds available.

| Example of $10,000 placed with the following One Year returns | | $ Cash return on investment | |
|---|---|---|---|
| 0.46% | Money Markets National Average* | = | $46.00 |
| 0.50% | Savings Account* | = | $50.00 |
| 2.00% | Variable Savings Account ING DIRECT Orange** | = | $200.00 |
| 1.67% | One year CD* | = | $167.00 |
| 2.18% | Two year CD* | = | $218.00 |
| 3.54% | Five year CD* | = | $354.00 |
| 8.00% | Various Trusts secured by real estate mortgages*** | = | $800.00 |
| 10.00% | Various Trusts secured by real estate mortgages*** | = | $1,000.00 |
| 15% | Minimum Investment of $10,000*** General Fund One year note (Not Secured) | = | $1,500.00 |
| 15.00% | Investment of $10,000.00 to $24,999.00*** One Year note secured by hard business assets | = | $1,500.00 |
| 20.00% | Investment of $25,000.00 to $49.,999.00*** One Year note secured by hard business assets | = | $2,000.00 |
| 25.00% | Investment of $50,000.00 to $74,999.00*** One Year note secured by hard business assets | = | $2,500.00 |
| 30.00% | Investment of $75,0000.00 or more*** One Year note secured by hard business assets | = | $3,000.00 |

Rates are based on Annual Percentage Yields.
Chart based on a deposit of $10,000.00 for one year except where noted.
Sources: *  Savings, CD, and money market avg. from Bankrate.com as of 1/8/04
           **  ING DIRECT savings Rates as of 8/07/03.
           *** Funds Managed by Alan Kosinski (Various Entities) as of 1/8/04
You should have your money making money.  If you have money in Savings Accounts, Money Market Accounts, Certificate of Deposits, Roth IRA, Regular IRA, and some 401k Accounts get them to start paying higher yields.  This is not an offering, but only a comparison chart. Savings accounts are generally FDIC insured. All other listed investments are not insured by the FDIC and are subject to investment risks, including the possible loss of principal amount invested.  Invest wisely.

10

After reviewing the leaflet, Douglas contacted Kosinski on January 31, 2004.  He testified

that "when he saw the interest rates . . . that he was offering here, to me it seemed like a

safe and simple - - or straightforward approach to get in some high returns without having

to understand all the intricacies of the real estate marketplace. . . ."   He and Kosinski

discussed the Salisbury Beach project, and Douglas made plans to go see the property.

Douglas testified as follows:

> We reviewed the interest rates that would be allowed for different levels of
> investment.  He then went on to discuss the opportunity he was presently
> working on in Salisbury Beach.
>
> He mentioned the Boston Waves nightclub, said that he was putting - - you
> know, refurbishing it and putting it together.  He did mention the delay,
> thought it was a one-month delay in getting the liquor license, instead of
> September it didn't come in until October of '03.  It didn't sound like
> therefore he had much, much operation in '03 but it looked like he was
> looking forward to the '04 season.

Refreshing his recollection with notes he took of the conversation, Douglas further testified

that the Debtor told him that he and Florek had spent close to a million dollars in cash.

Florek, however, testified that he made no personal loans to Pavilion Realty Trust or

Boston Waves, although he caused Exit Realty or AC Funding Realty Trust to write checks

to Pavilion Realty Trust.

Following one quick trip to Salisbury to look at the property, Douglas met Kosinski

at the Boston Waves club on Thursday, February 12, 2004 and took a tour of the premises.

Before traveling to Salisbury for the tour, Kosinski's assistant sent Douglas, via an -e-mail

attachment, a profit and loss statement, which forecast the earning capacity of Boston

Waves.  Douglas recounted that at the February 12, 2004 meeting Kosinski explained his plans for a "high end lounge" for "high rollers," and a restaurant, as well as "his thoughts about trying to get accredited investors together to purchase properties within the town and build up the property values which would then therein [sic] raise the value of the Boston Waves property and its operations."  Based upon the tour, his discussions with Kosinski, and the profit and loss statement, Douglas told Kosinski he was willing to invest in the project.  Douglas testified that he reviewed the profit and loss statement as best he could, determining that "[i]t looked like this was going to be a profitable enterprise," as it showed over a million dollars profit at the end of twelve months.[4]  Additionally, Douglas examined the projected expenses as set forth in the forecast, determining that, although "Loans" appeared as an entry on the profit and loss statement for the period between April of 2004 and March of 2005, no numbers were inserted for loan repayments.  He stated: "Well, I guess I took this as being accurate and honest and it said to me there were no loans," adding that he would not have invested without an accurate profit and loss statement.  Douglas also testified that, although he did not ask Kosinski for supporting documentation for his projections, he did ask him about the numbers utilized in the profit and loss statement.  According to Douglas, Kosinski represented that he obtained the numbers from speaking with Nabhan who had operated a nightclub at the same location.  Douglas also indicated that he was impressed with Kosinski's familiarity with Nabhan and

---

[4] Specifically, it showed $1,187,089 in profits broken down as follows: ($45,166) for April of 2004,  $251,026 for May through August of 2004, and $32,593 for September of 2004 through March of 2005.

12

Kosinki's representation that the lease was a twenty year lease.  Douglas stated:

> He - - just as in his other real estate dealings, where he analyzes a deal and
> its opportunities, he did the same with this one.  He knew of the landlord
> and the owner of the building, knew his age, he knew the health of the sister,
> he knew all the details of all the nuances.

> And just as he taught in some of his classes, he talked about the fact that he
> wouldn't - - he mentioned to me a 20-year lease on the property and said that
> he would have control of the property even though he wouldn't own the
> property. . . .

> [I]t reinforced and told me that this was a long-term investment for Mr.
> Kosinski and Boston Wave, and not a short-term fly-by-night enterprise.  It
> was one that I felt more comfortable investing, with making my first real
> estate investment in.

Douglas also indicated that Kosinski told him his investment would be secured by hard

assets and gave him a list, which, in Douglas' words, included "chairs, the sound system,

tables, inventory, [and] things like that."  Douglas testified that he failed to obtain security

for his loan, explaining:

> I just as well as most of the people that attended the investment club
> meetings looked up to Mr. Kosinski.  He is basically the teacher where the
> students respected him, thought him to be trustworthy, and it was almost  -
> - would have been an insult, I felt, to have asked him to put something more
> in writing than he already had."

In the evening of February 12, 2004, Douglas delivered a bank treasurer's check to

Kosinski made payable to the Pavilion Realty Trust in the sum of $75,000.  Kosinski, in his

capacities as trustee of Pavilion Realty Trust and manager of Boston Waves, executed a

promissory note to Douglas in which he promised to pay as follows:

> the sum of SEVENTY FIVE THOUSAND DOLLARS in One balloon payment
> due within TWELVE months from this date, with interest to be paid Monthly
> at the rate of THIRTY per cent per annum, during said term, and for such

further time as said principal sum, or any part thereof shall remain unpaid.
Monthly interest payment of $1,875.00 will be paid by the Fifteenth of each
month.

At the time Douglas delivered the check to Pavilion Realty Trust, Kosinski was unsure of

whether Boston Waves had obtained a full seasonal liquor license, although he

acknowledged that insurance on the property had been canceled.  Kosinski represented

that it was his belief that if Boston Waves did not have a seasonal all alcohol license in

February, he anticipated obtaining one for Boston Waves.  In a letter dated April 1, 2004

to the Salisbury Liquor Commission, suggesting that the liquor license was obtained

around that time, Kosinski, on behalf of Boston Waves, thanked the Commission for the

issuance of a license and disclosed Boston Waves' hours of operation.  For April, beginning

on the 16th of the month through May of 2004, the hours were  7:00 p.m. to 1:00 a.m., three

days per week, namely Thursday through Saturday.

Kosinski  testified that he did not prevent Douglas from conducting due diligence

with respect to his $75,000 investment and that he never told Douglas that Pavilion Realty

Trust had a twenty year lease with Nabhan.  He further testified that the profit and loss

forecast was a work in progress and that multiple versions existed.  Notably, Kosinski

submitted no exhibits to support his assertion that the profit and loss statement was, in fact,

a work in progress.  He stated that the figures used in the profit and loss statement came

from bills and cost analyses of food and drink.  He admitted, however that "some were

made up because we didn't know the numbers."

Douglas received several erratic payments from Kosinski, but they stopped after

14

September of 2004.[5] Douglas prepared a Repayment Log showing receipt of two payments on April 10, 2004 and two payments on August 24, 2004, as well as payments on May 26, 2004, July 10, 2004, and September 23, 2004.[6] He calculated that he was owed $169,849 as of November 8, 2008, with simple interest. The note was never secured with assets belonging to either Boston Waves or Pavilion Realty Trust. Douglas, however, did send letters to the Attorney General for the Commonwealth of Massachusetts registering his loan pursuant to the provisions of Mass. Gen. Laws ch. 271, § 49(d).

Nabhan, with whom Kosinki represented he consulted in the preparation of the profit and loss statement, reviewed the statement. He described the numbers utilized by Kosinski as "grossly exaggerated." Additionally, he testified that the wholesale purchase price of liquor was "way out of line" with the gross revenue that its sale would produce, that tax liabilities were seriously understated, and that the income from the parking lot was seriously overstated. He also testified that he forgave a portion of the rent, that Pavilion Realty Trust was about $25,000 behind in its rent payments in 2003 and that Pavilion Realty Trust failed to make all its rent payments in 2004. He added that Kosinski "vacated the premises on September 9th of 2004 in the morning hours in the dark of night and took with him as much personal property as he could move into [sic] with two trucks," leaving the

---

[5] Douglas kept a record of payments, but did not specify whether the payments were made in cash or by checks from Pavilion Realty Trust, Boston Waves, or Kosinski.

[6] Douglas recognized that the repayment dates listed for August 24, 2005 and September 23, 2005 were incorrect and should have been listed as received in 2004, not 2005.

premises in a disordered state with papers strewn everywhere. Kosinski did not dispute that he operated Boston Waves until September 9, 2004 when he vacated the premises, taking with him the sound system and all personal property, including two valuable paintings which Nabhan claimed was his.

Kosinski testified to a legion of problems, including the disaffection of his business partner, Jack Welch, whom Kosinski claimed undermined his authority with employees and caused trouble with officials in the Town of Salisbury. According to Kosinski, Welch ceased to be involved with Boston Waves in the fall of 2003. Kosinski recounted the negative public perception from lack of a full liquor license in 2003. He also detailed a disastrous evening in July or August of 2004 involving a scheduled performance by the rap artist Snoop Dogg. The scheduled performance precipitated a substantial police presence in the form of SWAT teams from Lawrence and Lowell, Massachusetts, in addition to police from Salisbury. The performance failed to take place as planned, resulting in a disgruntled and riotous audience, some of whom had expended $100 to be in a VIP section with Snoop Dogg and his entourage, as well as extensive negative publicity in Salisbury and elsewhere. According to Kosinski, Snoop Dogg arrived over three hours late, caused smoke detectors to go off when he lit a marijuana cigarette, and left without ever performing.

According to Kosinski, he realized that there was no recovering from the expensive debacle involving Snoop Dogg. He indicated that he had no choice but to close Boston

16

Waves, which Kosinski testified subsequently filed a voluntary Chapter 7 petition.[7]

## III. DISCUSSION

A. <u>The Motion to Allow Filing of Amended Complaint</u>

In his Complaint, Douglas alleged that Kosinski was personally liable for the monies he lent Pavilion Realty Trust and Boston Waves "because he deliberately and intentionally misrepresented the financial condition of Boston Waves" at the time he solicited funds from him.  He added that "the pro forma forecast Mr. Kosinski provided to Mr. Douglas was deliberately false, misleading and deceptive and that it was created by Mr. Kosinski for the purpose of inducing Mr. Douglas to lend money."  Douglas further alleged that had know the true financial condition of Boston Waves and Pavilion Realty Trust he would not have loaned Pavilion $75,000; that Kosinski made repeated representations about the financial condition of Boston Waves to persuade him to loan money to it, and that he reasonably relied upon Kosinski's representations to his detriment.  Because of his repeated reference to the financial condition of Boston Waves and the reference to a pro forma, the Court finds that Douglas sets forth a cause of action under 11 U.S.C. § 523(a)(2)(B) in his original Complaint.

In his Amended Complaint, Douglas added allegations that Kosinski made both express and implied representations that he had the ability to repay him upon the terms

---

[7] The Court takes judicial notice that Boston Waves filed a voluntary Chapter 7 petition on March 11, 2005.  The Chapter 7 trustee filed a Report of No Distribution on January 7, 2008.  The case is now closed.  The trustee commenced an action against Calvin Broadus a/k/a Snoop Dogg, which he settled for payment of $12,000, which sum was distributed to a secured creditor.

set forth in the promissory note "when he was well aware he could not do so;" that the money was going to be used for the nightclub when in fact it was going to be diverted to other business interests; and "that he had a twenty year lease on the premises where the nightclub was located." Douglas further amended his Complaint to aver that he justifiably relied upon those representations.

Federal Rule of Civil Procedure 15(b), made applicable to this proceeding by Fed. R. Bankr. P. 7015(b), allows amendment of pleadings to conform to the evidence if issues which are not raised in the original pleadings are raised at trial by the express or implied consent of the parties.   At trial, both parties offered evidence relevant to claims under both section 523(a)(2)(B) and section 523(a)(2)(A).  The Debtor did not object to evidence tending to establish Douglas's entitlement to relief under section 523(a)(2)(A).  More importantly, the Debtor was not unfairly prejudiced by the submission of evidence in support of a claim under section 523(a)(2)(A) as that evidence was in the form of Douglas's testimony.  Not only was Kosinski's counsel able to cross-examine Douglas, Kosinski was able to testify in rebuttal.  *See* Matter of Beaubouef, 966 F.2d 174, 177 (5th Cir. 1992)( "[e]ven where there is no consent, and objection is made at trial that evidence is outside the scope of the pretrial order, amendment may still be allowed unless the objecting party satisfies the court that he would be prejudiced by the amendment." Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449, 457 (10th Cir.1982). "In the absence of a showing of prejudice, the objecting party's only remedy is a continuance to enable him to meet the new evidence." Id.).  *See also* Tower Credit, Inc. v. Touchet (In re Touchet), 394 B.R. 418, 422 (Bankr. M.D. La. 2008).

18

Thus, the evidence adduced at trial amended Douglas's Complaint to include a cause of

action under 11 U.S.C. § 523(a)(2)(A).  Accordingly, the Court shall enter an order granting

the Motion to Allow Filing of Amended Complaint, although for the reasons set forth

below, the Court need not determine whether Douglas established the existence of a

nondischargeable debt under section 523(a)(2)(A).

> B. Is Kosinski personally liable for the obligations of Pavilion Realty Trust or Boston
> Waves?

In Kveraga-Olson v. Sternberg, 7 Mass. L. Rptr. 49 (Mass. Super. 1997), the court

summarized the law applicable to the potential liability of trustees of nominee realty trusts.

It stated:

> The trend in Massachusetts is to view the trustees of a nominee trust as
> agents for the principals' convenience rather than as trustees in the more
> traditional fiduciary sense. Apahouser Lock & Security Corporation v.
> Carvelli, 26 Mass.App.Ct. 385, 388, 528 N.E.2d 133, rev. den., 403 Mass. 1104,
> 530 N.E.2d 797 (1988). Thus, the courts have concluded that the protection
> from individual liability afforded trustees by G.L. c. 203, § 14A does not
> encompass the trustees of nominee and business trusts. First Eastern Bank,
> N.A. v. Jones, 413 Mass. 654, 661, 602 N.E.2d 211 (1992); Apahouser Lock &
> Security Corporation v. Carvelli, supra at 388, 528 N.E.2d 133; North Shore
> Protective Patrol & Detective Agency, Inc. v. Baldwin, 1991 Mass.App. Div.
> 61, 64.

Id. at *9 (footnote omitted).  In a footnote, the court observed that "Chapter 203, section

14A provides that a trustee is personally liable on contracts entered into in a fiduciary

capacity only if he failed to reveal his representative capacity and identify the trust estate

in the contract, and is personally liable for torts committed in the administration of the

trust estate only if he was personally at fault. G.L. c. 203, § 14A (1981)."  The court further

determined that "under common law principles of agency, the trustees of a nominee trust

19

may be held individually liable for torts committed in the administration of a trust, whether or not they are personally at fault." Sternberg, 7 Mass. L. Rptr at *10 (citing Larson v. Sylvester, 282 Mass. 352, 357-358, 185 N.E. 44 (1933), and First Eastern Bank, N.A. v. Jones, 413 Mass. at 659); *see also* In re Lebner, 197 B.R. 180, 192 (Bankr. D. Mass. 1996). Additionally, to the extent Kosinski may be a beneficiary of the Pavilion Realty Trust, "'[i]n the case of nominee trusts, liability has been imposed directly upon the beneficiaries, the theory being that the relationship created by such an instrument is in the nature of a partnership and not a trust, or that the trustees were merely the agents 'for the principals' convenience.'" *See* F.D.I.C. v. Porter, 46 Mass. App. Ct. 241, 704 N.E.2d 1203, 1205 (1999)(citations omitted).

The Court finds that under Massachusetts law, as set forth above, Kosinski is not shielded from liability for a nondischargeable debt based upon his status as a trustee or as a beneficiary of a Massachusetts nominee trust. Additionally, although the language utilized in the Pavilion Realty Trust purports to preclude the imposition of personal liability on the trustee, there is an exception for "willful misconduct knowingly and intentionally committed." Thus, even were Kosinski shielded from liability under Massachusetts law, under the trust instrument, he could still be held liable for willful and intentional misconduct in his capacity as trustee.

The Pavilion Realty Trust was the signatory to the lease with Nabhan and, based upon the evidence presented, the lease was its only asset. The Pavilion Realty Trust borrowed money from private investors and funneled the borrowed funds to Boston

Waves. Kosinki executed promissory notes, as trustee, intending that the funds would be used to fund the operations of Boston Waves. At the time he executed the promissory note in favor of Douglas, on February 12, 2004, he intended and so advised Douglas that the funds would be transferred to and used by Boston Waves. From the evidence presented, the Court infers that in February of 2004, Boston Waves likely was insolvent, a condition noted by Florek who indicated that neither Boston Waves' financial statements or its financial health was ever good. Notably, the value of its assets, comprised of a short term lease with the Pavilion Realty Trust requiring annual rent of $90,000, an installed sound and light system, tables and chairs, liquor inventory, and miscellaneous restaurant and bar equipment, was probably worth less than the $350,000 or more Kosinski borrowed from private investors. Kosinski's conduct in procuring additional funds from Douglas for Boston Waves' operations must be considered in the context of Boston Waves' likely insolvency. Thus, Kosinski's action, as trustee of Pavilion Realty Trust, in borrowing money from Douglas for an insolvent entity can be considered willful and intentional misconduct, exposing him to personal liability under the provisions of the trust instrument.

Finally, the Court finds that the Debtor is estopped from asserting that he is immune from liability as trustee of the Pavilion Realty Trust in view of his bankruptcy petition which he filed both individually and as trustee of numerous realty trusts, including the Pavilion Realty Trust. By listing various trust entities and debts incurred by those entities, the Debtor intended or at least hoped to discharge those debts. Accordingly, the Debtor cannot complain when a trust creditor, such as Douglas, filed an objection to the

21

dischargeability of the obligation incurred by Kosinski as trustee of the Pavilion Realty

Trust. By listing the various trusts for which he served as trustee on his petition, the

Debtor all but admitted that he was liable for those obligations.

Similarly, the Court finds that under Massachusetts law, Kosinski as the manager

of Boston Waves, can be held liable for the debts of that limited liability company. As

noted by the United States Bankruptcy Appellate Panel for First Circuit, in Aoki v. Atto

Corp. (In re Aoki), 323 B.R. 803 (1st Cir. 2005),

> In Massachusetts, corporations and their shareholders are generally deemed
> to be distinct legal entities. See Berger v. H.P. Hood, Inc., 416 Mass. 652, 624
> N.E.2d 947, 950 (1993). However, under unusual circumstances, a court may
> disregard the corporate form, particularly to defeat fraud or remedy an
> injury. See id.; see also In re Plantation Realty Trust, 232 B.R. 279, 282 (Bankr.
> D. Mass.1999). "The incidents of common ownership and management,
> standing alone, are not enough to pierce the corporate veil." Plantation
> Realty, 232 B.R. at 282. However, "shareholders may be held liable where
> they control the operation of the corporation and run it for their personal
> benefit, and where justice requires that the separate existence of the
> corporation be ignored." Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers,
> Inc., 754 F.2d 10, 15 (1st Cir.1985) (" Pepsi-Cola").

323 B.R. at 811. The panel added:

> The Massachusetts Supreme Judicial Court has described two situations
> when piercing the corporate veil is appropriate: "(1) when there is active and
> direct participation by the representatives of one corporation, apparently
> exercising some form of pervasive control, in the activities of another and
> there is some fraudulent or injurious consequence of the intercorporate
> relationship, or (2) when there is a confused intermingling of activity of two
> or more corporations engaged in a common enterprise with substantial
> disregard of the separate nature of the corporate entities, or serious
> ambiguity about the manner and capacity in which the various corporations
> and their respective representatives are acting." My Bread Baking Co. v.
> Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748, 752 (1968) (" My
> Bread").

Adopting the <u>My Bread</u> standard, the Court of Appeals for the First Circuit
set forth twelve factors to consider when deciding whether to pierce the
corporate veil:

(1) common ownership;
(2) pervasive control;
(3) confused intermingling of business activity, assets, or management;
(4) thin capitalization;
(5) nonobservance of corporate formalities;
(6) absence of corporate records;
(7) no payment of dividends;
(8) insolvency at the time of the litigated transaction;
(9) siphoning away of corporate assets by the dominant shareholders;
(10) nonfunctioning of officers and directors;
(11) use of the corporation for transactions of the dominant shareholders; and
(12) use of the corporation in promoting fraud.

<u>Pepsi-Cola</u>, 754 F.2d at 16; *see also* <u>Evans v. Multicon Constr. Corp.</u>, 30
Mass.App.Ct. 728, 574 N.E.2d 395, 398 (1991) (applying the <u>Pepsi-Cola</u>
factors); <u>The George Hyman Constr. Co. v. Gateman</u>, 16 F.Supp.2d 129, 151
(D. Mass.1998) (same). Generally, in Massachusetts, <u>My Bread</u> sets the
standard for deciding when to pierce the corporate veil, and <u>Pepsi-Cola</u>
identifies a non-exclusive list of factors to be considered when engaging in
a <u>My Bread</u> analysis. *See, e.g.,* <u>Birbara v. Locke</u>, 99 F.3d 1233, 1238 (1st
Cir.1996). This analysis is also applicable in the bankruptcy context. *See*
<u>MacDonald</u>, 114 B.R. at 331 (the equitable powers of the bankruptcy court
enable them to apply the <u>My Bread</u> and <u>Pepsi-Cola</u> analysis to pierce the
corporate veil in order to attribute a non-debtor corporation's assets or
liabilities to the shareholders of the corporation) (citation omitted).

<u>Aoki</u>, 323 B.R. at 811-12. The Court observes that, with respect to Boston Waves, many of

the factors listed by the panel in <u>Aoki</u> are present, including Kosinski's pervasive control

of Boston Waves, the absence of corporate records, and thin capitalization or insolvency,

as well use of the limited liability company to promote fraud.

In view of the foregoing provisions of Massachusetts law, Kosinski cannot escape

liability under Massachusetts law applicable to nominee trusts and piercing the corporate

veil.  The questions then becomes whether Douglas can satisfy all the required elements

for an exceptions to discharge under either section 523(a)(2)(B) or section 523(a)(2)(A).

C. <u>Applicable Law under Section 523(a)(2)</u>

Both section 523(a)(2)(A) and 523(a)(2)(B) refer to "the debtor's or an insider's

financial condition." Section 523(a)(2)(A) carves out an exception for statements respecting

a debtor's or an insider's financial condition, while section 523(a)(2)(B) requires such

statements to be in writing.  Tension exists as to the proper interpretation of the phrase.

In <u>Schneiderman v. Bogdanovich (In re Bogdanovich)</u>, 292 F.3d 2d 104, 112-113 (2d Cir.

2002), the Second Circuit observed:

> In determining whether a statement relates to a debtor's financial condition,
> courts agree the term is not limited to formal financial statements. *See*
> <u>Norcross v. Ransford (In re Ransford)</u>, 202 B.R. 1, 4 (Bankr. D. Mass. 1996).
> Two views have emerged over how to interpret the scope of § 523(a)(2)(A)'s
> exception. A broad interpretation would include any statement that reflects
> the financial condition of the debtor. <u>Id.</u> On the other hand, a narrow
> interpretation would find that a statement relates to financial condition only
> when it provides information "as to [a debtor's] overall financial health." <u>Id.</u>

292 F.3d at 112.  *See also* <u>Buckeye Retirement Co., LLC, Ltd. v. Kakde (In re Kakde)</u>, 382 B.R.

411, 421-22 (Bankr. S.D. Ohio 2008).  Judge Boroff explained the rationale behind the

approaches in <u>Norcross v. Ransford (In re Ransford)</u>, 202 B.R. 1 (Bankr. D. Mass. 1996). He

stated:

> [T]he liberal interpretation would assign to the term any statement which
> applies to the financial condition of the debtor, while the narrow
> interpretation would limit the term to statements as to the Debtor's overall
> financial health. <u>Id.</u> The effect of the categorization is profound. Where the
> interpretation of the term is liberal, the subject misstatement is likely
> precluded as the basis of nondischargeability under § 523(a)(2)(A), and,
> absent a writing, has no place under § 523(a)(2)(B). Where the interpretation

24

of the term is narrow, a nondischargeability claim is more likely to be sustained under § 523(a)(2)(A).

202 B.R. at 4. He concluded that the proper approach was to examine the purpose of the statement, relying upon the approach in <u>Jokay Co. v. Mercado (In re Mercado)</u>, 144 B.R. 879 (Bankr. C.D. Cal. 1992). He concluded: "In focusing upon the purpose for which the statement was made, Judge Ryan [in <u>Mercado</u>] provided a framework for better distinguishing between a statement which implicates a debtor's financial condition from one that does so only incidentally." 202 B.R. at 5.

In <u>Middlesex Sav. Bank v. Flaherty (In re Flaherty)</u>, 335 B.R. 481 (Bankr. D. Mass. 2005), this Court set forth a narrow interpretation of section 523(a)(2)A) in reviewing the law applicable to 11 U.S.C. § 523(a)(2)(B). While noting that exceptions to discharge under section 523(a)(2) require proof of each and every element by a preponderance of the evidence, <u>Grogan v. Garner</u>, 498 U.S. 279, 286 (1991), this Court stated:

> The exception to discharge under § 523(a)(2)(A) does not deal with deception by means of a statement relating to the debtor's or an insider's financial condition, which is the subject of section 523(a)(2)(B). Section 523(a)(2)(B) provides that a "discharge under section . . . 727 . . . of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by use of a statement in writing that is materially false; respecting the debtor's or an insider's financial condition; on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and that the debtor caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2)(B) (emphasis added). *See* <u>In re Coughlin</u>, 27 B.R. 632, 635-36 (1st Cir. BAP 1983).

> Section 523(a)(2)(B) pertains to a specific type of financial statement, "one that specifically states a debtor's or insider's net worth". <u>City Fed. Savs. Bank v. Seaborne (In re Seaborne)</u>, 106 B.R. 711, 713 (Bankr.M.D.Fla.1989)(citing <u>Brigadier Homes & U.S. Home Acceptance Corp. v. Hert</u>, 81 B.R. 638 (Bankr.

N.D. Fla. 1987)). . . .

In re Flaherty, 335 B.R. at 490.  Although use of labels such as broad and liberal may facilitate analysis in some circumstances, the Court finds Judge Boroff's approach in Ransford compelling.  Thus, in addition to focusing on each and every element of section 523(a)(2)(B),[8] an analysis of the purpose of a statement as to the debtor's or an insider's financial condition also is warranted.

In Flaherty, this Court also addressed section 523(a)(2)(B)'s reasonable reliance element.  It stated;

> A determination of whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances. Lease Corp. of Amer. v. Harloff (In re Harloff), 272 B.R. 496, 500 (Bankr.M.D.Fla.2001). According to the court, in Harloff,

> > [a]mong the circumstances that might affect the reasonableness of a creditor's reliance are (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

---

[8] The requirement that the statement be in writing "is an evidentiary protection for a defendant/debtor because it requires the plaintiff/creditor to prove fraud based on misrepresentations of financial condition using the more rigorous reasonable reliance standard." McCrary v. Barrack (In re Barrack), 217 B.R. 598, 605 (B.A.P. 9th Cir. 1998) (citing Field v. Mans, 516 U.S. 59, 72-77 (1995)). The terms used in section 523(a)(2)(A) are common-law terms requiring only "justifiable" reliance. Id.

Id. (citing <u>BancBoston Mortgage Corp. v. Ledford (In re Ledford)</u>, 970 F.2d
1556, 1560 (6th Cir.1992), *cert. denied*, 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d
667 (1993), and <u>Martin v. Bank of Germantown (In re Martin)</u>, 761 F.2d 1163,
1166-67 (6th Cir.1985)).

<u>In re Flaherty</u>, 335 B.R. at 490-91.

    D. <u>Does the profit and loss statement of Boston Waves qualify as a statement of an
       insider's financial condition and was it materially false?</u>

    The profit and loss statement prepared by Kosinski was intended to induce Douglas

to invest in Boston Waves, although Douglas wrote a check in the amount of $75,000 to

Pavilion Realty Trust.  Boston Waves was an "insider" of the Debtor.  Although 11 U.S.C.

§ 101(31) does not specifically list limited liability companies, which have incidents of both

corporations and partnerships, there can be no question that Kosinski, as the manager of

Boston Waves, was in a position analogous to either a general partner in a partnership

comprised of the members of Boston Waves or a corporate officer or person in control of

Boston Waves.

    Consistent with the analysis used by the courts in <u>Ransford</u> and <u>Mercado</u>, the Court

finds that the profit and loss statement was intended to show that Boston Waves had the

capacity to generate income to repay Douglas's investment. *See* <u>In re Delano</u>, 50 B.R. 613,

617 (Bankr. D. Mass. 1985)("It is well-settled that where the debtor is an officer and

shareholder of a corporation and he uses a false financial statement to induce a creditor to

extend credit to the corporation, the individual debtor is considered to have obtained

money within the meaning of § 523(a)(2)(B).").  While not a statement of net worth, *per se*,

a profit and loss statement is a statement of financial condition. <u>Bal-Ross Grocers, Inc. v.</u>

Sansoucy (In re Sansoucy), 136 B.R. 20, 23 (Bankr. D. N.H. 1992).  In Sansoucy, the court,

adopting a narrow construction of the term "financial condition," stated: "a 'statement of

a debtor's or insider's financial condition' as used in § 523(a)(2)(A) and (B) means a balance

sheet and/or profit and loss statement or other accounting of an entity's overall financial

health and not a mere statement as to a single assert or liability."  *See also* Cadwell v.

Joelson (In re Joelson), 427 F.3d 700, 714 (10th Cir.  2005), *cert. denied,* 547 U.S. 1163 (2005)

("false statements are those that purport to present a picture of the debtor's overall

financial health," including "those analogous to balance sheets, income statements,

statements of changes in overall financial position, or income and debt statements that

present the debtor or insider's net worth, overall financial health, or equation of assets and

liabilities. . . . What is important is not the formality of the statement, but the information

contained within it-information as to the debtor's or insider's overall net worth or overall

income flow."); Fairfax State Savs. Bank v. McCleary (In re McCleary), 284 B.R. 876, 884

(Bankr. N.D. Iowa 2002)(finding that profit and loss statement qualified as a statement of

the debtor's financial condition); Skull Valley Bank of Goshute Indians v. Chivers (In re

Chivers), 275 B.R. 606, 615-16 (Bankr. D. Utah 2002); Weiss v. Alicea (In re Alicea), 230 B.R.

492, 502-04 (Bankr. S.D. N.Y. 1999); *but see* Engler v. Van Steinburg (In re Van Steinburg),

744 F.2d 1060, 1061 (4th Cir. 1984)("A debtor's assertion that he owns certain property free

and clear of other liens is a statement respecting his financial condition.  Indeed, whether

his assets are encumbered may be the most significant information about his financial

condition.").

The Court finds that the profit and loss statement sent to Douglas at Kosinski's direction constitutes a statement of an insider's financial condition for purposes of section 523(a)(2)(B) as it contained a representation of the ability of Boston Waves to generate income. Moreover, the Court finds that the statement was materially false. "A materially false statement is one which paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." Merchant's Nat'l Bank v. Denenberg (In re Denenberg), 37 B.R. 267, 271 (Bankr. D. Mass. 1983) (citing Heinold Commodities & Securities, Inc. v. Hunt (In re Hunt), 30 B.R. 425, 440 (Bankr. M.D. Tenn. 1983)). "The question of materiality should be judged not on the basis of the size or seriousness of the error, but by a comparison of the debtor's actual financial condition with the picture he paints of it." Id. (citing First Safety Fund Nat'l Bank v. Valley (In Re Valley), 21 B.R. 674 (Bankr. D. Mass. 1982)).

In the profit and loss statement forwarded to Douglas, Kosinski grossly overstated the ability of Boston Waves to generate income and omitted any reference to loan repayments, although he had caused Boston Waves and Pavilion Realty Trust to execute numerous promissory notes in the spring of 2003 that were in default at the time the statement was prepared. Nabhan testified as to the unrealistic and inflated revenue amounts set forth in the statement. By listing an expense category for loans and then omitting any loan payments, Kosinski also created the false impression that, aside from normal operating expenses, there were no liens or other forms of indebtedness encumbering the assets of Boston Waves or requiring payments which could eliminate or

29

jeopardize its projected profits.  The Court finds that, under either a narrow or broad

construction of "financial condition," Kosinski's written representations in the profit and

loss statement that Boston Waves would have more than sufficient income to repay

Douglas' investment and that it had no outstanding loans to jeopardize its profits were

statements of its financial conditions.  *See, inter alia,* In re Joelson, 427 F.3d at 713-14; *see also*

In re Van Steinburg, 744 F.2d at 1061.

F. Did Douglas rely on the profit and loss statement and was his reliance reasonable?

Douglas testified that he relied upon the profit and loss statement and that he would

not have made the $75,000 loan to the Pavilion Realty Trust had he not received it.  The

critical question is whether his reliance was reasonable.  *See* 11 U.S.C. § 523(a)(2)(B).

According to the United States Bankruptcy Appellate Panel for the First Circuit,

> Once reliance on the financial statement is established, most courts have held
> that a showing of partial reliance is sufficient: the creditor need not
> demonstrate that it was motivated solely by the false financial information.
> Lincoln First Bank v. Tomei (In re Tomei), 24 B.R. 204, 9 B.C.D. 1166, 1167
> (D.Ct.W.D.N.Y.1982). *Contra* Thomson-MacConnell Cadillac, Inc. v. Isaacs (In
> re Isaacs), 15 B.R. 210, 210 (Bkrtcy.S.D.Ohio 1981) (financial statement must
> be "backbone of the issuance of credit"). All that is required is that the
> financial statement was a "'contributory cause of the extension of credit.'"
> American Bank & Trust v. Drewett (In re Drewett), 13 B.R. 877, 880 (Bkrtcy.
> E.D.Pa. 1981) (quoting State Employees Credit Union of Md., Inc. v. Shipley
> (In re Shipley), 1 B.R. 85, 90 (Bkrtcy. D. Md. 1979)). . . .

In re Coughlin, 27 B.R. 632, 637 (B.A.P. 1st Cir. 1983).  *See also* Teachers Credit Union v.

Johnson (In re Johnson), 131 B.R. 848, 854-55 (W.D. Mo. 1991); Lyndon Property Ins. Co. v.

Adams (In re Adams), 312 B.R. 576, 585 (Bankr. M.D.N.C. 2004).

The profit and loss statement was the lynchpin of written and oral representations

made by Kosinski to Douglas to obtain an extension of credit. Kosinski, the teacher, solicited investments from his students. He targeted his students for investment opportunities and encouraged them to utilize their retirement savings. He left pamphlets and fliers at meeting sites to advertise investment opportunities. In his "Best Investment" document, which Douglas picked up after a meeting, he compared cash returns on investments in his enterprises with those obtainable from certificates of deposits. He represented that investments in "Funds Managed by Alan Kosinski" would yield interests between 15% and 30% and that they would be "secured on hard business assets." The advertisement had the desired effect and prompted Douglas to contact Kosinski who proposed a tour of the Boston Waves property. Prior to the tour, Kosinski caused the profit and loss statement to be sent to Douglas. During the tour, Kosinski touted Boston Waves' potential and represented that it had a twenty-year lease on the property, embroidering his evaluation of the investment opportunity with details about Nabhan and his sister. Although Douglas and Kosinski did not have a close personal relationship or friendship, Kosinski held a position of trust and had an elevated stature in Douglas's eyes as a millionaire real estate investment guru. Douglas accepted his representations as true and hesitated to question him about the security for the loan for fear of insulting him. Douglas testified that he was nervous because this was his first investment. The Court finds that Kosinski's assurances caused him to overlook "red flags" that may have alerted a more savvy lender to the possibility that the representations in the profit and loss statement were inaccurate. Although Douglas had the opportunity to perform additional investigations

31

as to the accuracy of the profit and loss statement, he clearly failed to recognize that Kosinski was a predator and the numbers set forth in the profit and loss statement were grossly inflated. Moreover, Kosinski described his vision for the nightclub, setting forth his plans to book well-known acts and sponsor other events, which would produce income over and above daily operations. Douglas drove to Salisbury to see the property before taking a tour with Kosinski and he demanded to know the source of the numbers set forth in the profit and loss statement. Kosinski informed him, untruthfully, that he spoke with Nabhan in formulating the projections set forth in the profit and loss statement. The Court finds that under the totality of the circumstances, Douglas's reliance on the profit and loss statement was reasonable. Kosinski had crafted a routine to obtain funds by giving his private investors tours of the Boson Waves nightclub and elaborating on his vision of developing the Salisbury beach area. Under the practiced influence of Kosinski, Douglas's naivety cannot be said to negate the element of reasonable reliance.

G. Did Kosinski intend to deceive Douglas?

For the reasons set forth above, the Court finds that Kosinski, in fact, intended to deceive Douglas. Without further investment, Boston Waves was in jeopardy of closing. Florek testified as to Kosinski's repeated requests for money to keep the business afloat. In January of 2004, Kosinski's need for cash to operate Boston Waves caused him to advertise rates of return for funds he managed at usurious rates. Had Kosinski informed Douglas that Boston Waves had just a two year lease with options, a track record of making less than $30,000 in 2003, and a canceled insurance policy, instead of the potential to earn

32

over one million dollars, the Court finds that Douglas would not have invested in Pavilion Realty Trust.

The Court further finds that Kosinski is personally liable for both Pavilion Realty Trust's debt to Douglas and Boston Wave's debt to Douglas for the reasons set forth above.

H. Count II of the Amended Complaint Is Moot

Because the Court has found that Douglas satisfied the required elements of a cause of action under section 523(a)(2)(B), the Court need not address Count II of his Amended Complaint.

IV. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of the Plaintiff and against he Defendant on Count I of the Plaintiff's Amended Complaint. The Debtor's obligation to Douglas is excepted to discharge pursuant to 11 U.S.C. § 523(a)(2)(B). Count II of the Amended Complaint is moot.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: February 4, 2009
cc: Jenny l. Redden, Esq., William F. Spallina, Esq.

33

34